ORIGINAL

# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GEORGE MANIRE,

    Plaintiff

-vs-

AMERICAN EQUITY MORTGAGE

    Defendant             /

CASE NO. 04-60278

JUDGE: MARIANNE O. BATTANI

SEQUARA M. HENRY  (P65526)
Attorney for Plaintiff
30500 Van Dyke, Suite 700
Warren, Michigan 48093
(586) 574-4400

J. BENJAMIN DOLAN (P47839)
Attorney for Defendant
38525 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7535         /

**FILED**

JUL 1 1 2005

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

Plaintiff George Manire relies on the facts and law set forth in the accompanying Brief in

Support of Plaintiffs Response to Defendant's Motion for Summary Judgment pursuant

to Rule 56 for its Motion.

Respectfully submitted,

UAW LEGAL SERVICES PLAN
By: SEQUARA M. HENRY (P65526)
30500 VAN DYKE, SUITE 700
WARREN, MI 48093
(586) 574-4400

Dated: July 8, 2005

## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GEORGE MANIRE,

     Plaintiff

-vs-                    CASE NO. 04-60278

AMERICAN EQUITY MORTGAGE     JUDGE: MARIANNE O. BATTANI

     Defendant
_____/

SEQUARA M. HENRY  (P65526)
Attorney for Plaintiff
30500 Van Dyke, Suite 700
Warren, Michigan 48093
(586) 574-4400

J. BENJAMIN DOLAN (P47839)
Attorney for Defendant
38525 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7535
_____/

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

# TABLE OF CONTENTS

QUESTIONS PRESENTED

I.      INTRODUCTION……………………………………………………….. ...1

II.     STATEMENT OF FACTS……………………………………………………2

III.    ARGUMENT……………………………………………………………..5

        A.   Standard of Review………………………………………………….5

        B.   Whether Counts I. And II. Of Plaintiffs complaint (intentional and
             Negligent Misrepresentation) should be dismissed pursuant to
             Fed.R.Civ.P. 56?…………………………………………………..5

        C.   Whether Count III of Plaintiff's Complaint (Breach of Contract) should be
             dismissed pursuant to Fed.R.Civ.P. 56?…………………………………...6

        D.   Whether Count IV (Violation of the Equal Credit Opportunity Act) should
             be dismissed pursuant to Fed.R.Civ.P. 56?……………………………..…7

IV.     CONCLUSION………………………………………………………………….8

## QUESTIONS PRESENTED

I.     Whether Counts I. and II. of Plaintiffs complaint (intentional and
       Negligent Misrepresentation) should be dismissed pursuant to
       Fed.R.Civ.P. 56?

       Plaintiff says "No"

II.    Whether Count III of Plaintiff's Complaint (Breach of Contract) should be
       dismissed pursuant to Fed.R.Civ.P. 56?

       Plaintiff says "No"

III.   Whether Count IV (Violation of the Equal Credit Opportunity Act) should
       be dismissed pursuant to Fed.R.Civ.P. 56?

       Plaintiff says "No"

## CONTROLLING AUTHORITIES

**Case Law**

Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986)

**Statutes**

15 U.S.C. 1691 (d)


**Court Rules**

Fed. R. Civ. P. 56

# I.    INTRODUCTION

In this action, Plaintiff, George Manire ("Manire") filed a Complaint against Defendant American Equity Mortgage, Inc ("Defendant") based upon intentional and negligent misrepresentations that were made by Defendant, breach of contract and violations of the Equal Credit Opportunity Act.

During the course of the sale of the loan, Defendant and its agents, intentionally and knowingly made, or caused to be made, the misrepresentations regarding the loan agreement, intending that they be relied upon by Plaintiff.  Representative, Morris Wilson ("Wilson") represented that there would be a reduction in the interest rate of Manire's Mortgage from 8.0% to 6.45 % in six months after closing the loan. In pressuring Manire to refinance his loan with Defendant, Wilson represented to Manire that after six months he would get a lower interest rate.  Therefore, according to Wilson it was in Manire's best interest to refinance now and wait six-months to get a 6.45% interest rate.

Defendant and its agents knew that the representations were not true, or made them with reckless disregard for the truth. Manire relied on the misrepresentations to his detriment and Defendant intended that they be relied upon.  Without these misrepresentations, Manire would not have agreed to refinance his home with Defendant because Plaintiff already had an 8.3 % interest rate on $130,000 loan with National City. (Deposition transcript ("Dep tr") of George Manire, p 9) Why would he refinance his loan to 8.0% interest rate on $144,000 to pull out $3, 978.26?

A couple of months later, Manire was again promised the same 6.45% interest rate by Eric Meadow in May 2004.  Manire has yet to receive the 6.45% interest rate as promised twice by Defendant.

Accordingly, George Manire respectfully request that this Court Deny Defendant's Motion for Summary Judgment and proceed to trial on this matter.

## II.   STATEMENT OF FACTS

The facts regarding Manire's contacting Defendant regarding information about refinancing his home are undisputed. In January 2004, Manire contacted Defendant for information concerning refinancing his loan. (Manire Dep tr, p 8-9). Manire contacted Defendant after hearing a radio advertisement advertising a six point interest loan with semi-good credit (Manire Dep tr, p-8-9). Wilson was the loan officer assigned to Manire's file. (Deposition Transcript of Morris Wilson, p 6). Manire executed a loan application with Defendant for a loan of $144,000 at 8.0 % interest rate, with the promise of a reduction to 6.45% interest rate after six months. Thereafter, Wilson notified Manire by telephone that his loan had been approved (Wilson Dep tr, p 8). Neither Defendant nor Wilson sent out any letter informing Manire of the status of his loan with 30 days of the application in violation of the Equal Credit Opportunity Act.

On January 29, 2004, Manire executed a Note and Mortgage in the amount of $144,000 with an interest rate of 8.0%, all in reliance by Defendant of the reduction to 6.45% interest rate in six months. (Exhibit A). At the closing, disbursements of $3,978.26 were used to pay off Manire's small credit card debt.

Defendant sold the Manire's Note and Mortgage to New Century Mortgage subsequent to closing the loan (Manire Dep tr, p 36). Once Manire received notice that his Note and Mortgage was sold to New Century; he contacted New Century regarding the 6.45% interest rate after six months. (Manire Dep tr, pp37-39). New Century was

unaware of any such agreement. Although there was nothing in the written loan agreement about the 6.45% interest rate.   Manire relied on the representations and inducements by Wilson when refinancing his Mortgage with National City at $130,000 at 8.3% interest rate to $144,000 at 8.0% interest with Defendant.   Manire did not receive any real benefits from refinancing his mortgage with Defendant.   Defendant argues that Manire pulled cash out to pay off credit card debt.   However, Manire only received disbursements of $3,978.26 to pay off small credit card debt.   These mortgages are not even comparable.   Manire relied on the representation by Defendant to his detriment.

After receiving no resolution with New Century, Manire then contacted Defendant about the representations made by Wilson about the reduction of his loan to a 6.45% interest rate. Manire spoke to Eric Meadow, Great Lakes Area Manager ("Meadow") regarding his concerns with his loan (Manire Dep tr, pp 48-49). Manire explained the situation to Meadow and Meadow offered Manire either a return of a portion of his closing costs or a new loan (re-originated loan) with the same principal balance, but at an interest of 6.45% (Manire Dep tr, pp 52-53; and meadow Dep tr, pp 14-15).   Manire chose the refinancing with the lower interest rate that he was promised originally.

Meadow faxed Manire a set of loan application documents in order to proceed with 6.45% interest rate he was promised once again by Meadow.  On May 6, 2004, Manire executed and returned the second loan application documents to Defendant (Manire Dep tr, pp 54-55; Exhibits B).   Manire mistakenly believed that the loan documents constituted the final Mortgage and he believed that he had a new Mortgage at $144,000 at 6.45% interest (Manire Dep tr, pp 55-57).   Defendant argues that the loan

3

was approved but Manire never closed on the second loan (Meadow Dep tr, Pp 8-9). However, Manire never received any notice of action on his application with 30 days. Defendant has a duty to notify Plaintiff of action on his application, explicit or implicit, within 30 days. (15 U.S.C. 1691(d), Reg B sec. 202.9) Defendant breached this duty because Plaintiff never received any notice of approval or adverse action rejecting his May 6, 2004 credit application within 30 days.

Defendant argues that the second loan approval expired and thereafter, Defendant sent a letter advising Manire that Loan approval was withdrawn. Manire was never in receipt of such a letter  (Exhibit 12 of Manire Deposition).  The letter is not dated nor signed by anyone. We have no idea when this letter was generated.  The first mention of this letter was at the Manire Deposition held on May 25, 2005.  Meadow never sent a letter to Manire describing any action taken on his loan application. (Dep transcript of Eric Meadow, P 11-12).

There are genuine issues of material fact and Defendant's Motion for Summary Judgment pursuant to Rue 56 should be denied and this matter set for trial.

## III.   ARGUMENT

### A. Standard of Review

Rule 56(c) of the Federal Rules of Civil procedure provides that judgment; shall be rendered forthwith of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show that there is no genuine issue of material fact and that the moving party is entailed to judgment as a matter of law". Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as the to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. Celetex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B. Whether Counts I. and II. of Plaintiffs Complaint (Intentional and Negligent Misrepresentation) should be dismissed pursuant to Fed.R.Civ.P. 56?

To establish a claim of misrepresentation, Manire must establish that:  (1) Wilson made a material misrepresentation; (2) that it was false; (3) that when Wilson made the representation Wilson knew that it was false or made it recklessly; or (4) that Wilson made it with intention that Manire should act on it; (5) that Manire acted in reliance on it: and (6) Manire suffered damages.  Manire has asserted from the very beginning that Wilson made material misrepresentations to him.  The misrepresentation was false because Manire never received any such reduction in interest rate as promised.  Neither Defendant nor Wilson ever intended to reduce Manire interest rate to 6.45%.  By promising Manire the reduction in interest rate after six months Defendant and Wilson intended to Manire induce Manire into refinancing his Mortgage with Defendant. Manire went from $130,000 8.3% interest

loan to $144,000 8.0% interest relying on Wilson's promise.  Manire did not receive any benefits from refinancing the loan with Defendant.

Accordingly, Counts I and II state genuine issues of material fact as to an essential element of Plaintiff's case and Defendant's Motion for Summary Judgment should be denied.

### C.  Whether Count III of Plaintiff's Complaint (Breach of Contract) should be dismissed pursuant to Fed.R.Civ.P. 56?

Although there was nothing in the written loan agreement about the 6.45% interest rate.  Manire relied on the misrepresentations and fraudulent inducements by Wilson when refinancing his Mortgage with National City at $130,000 at 8.3% interest rate to $144,000 at 8.0% interest with Defendant.  In fact Meadow never received an approval for Manire at a 6.45% interest rate.  On June 3, 2004, a loan was approved at $145,000 at 7.6% interest rate (Exhibit C).  There is no documentation that Manire ever received an approval for 6.45% interest rate.  Again, Defendant intentionally misrepresented facts to Manire after Meadow asserted that the interest rate quoted by home over the phone was the interest rate they Manire was approved for (Dep tr Meadow, pp 8-9).

Accordingly, Count III states genuine issues of material fact as to an essential element of Plaintiff's case and Defendant's Motion for Summary Judgment should be denied.

### D. Whether Count IV (Violation of the Equal Credit Opportunity Act) should be dismissed pursuant to Fed.R.Civ.P. 56?

Under the Equal Credit Opportunity Act ("ECOA"), (15 U.S.C. 1691(d), Reg B sec. 202.9) it specifically states that Defendant had a duty to notify Plaintiff of approval his application, explicit or implicit, within 30 days. (15 U.S.C. 1691(d), Reg B sec. 202.9) Defendant also had a duty to notify Manire of any adverse action.   Defendant breached this duty because Plaintiff never received any notice of approval or adverse action rejecting his May 6, 2004 credit application within 30 days from Defendant.

Defendant argues that a letter was sent to Manire advising him that Loan approval was withdrawn. However, Manire never received a letter because no letter was ever sent to Manire.  The first mention of and production of this letter by the Defendant was at the Manire Deposition held on May 25, 2005. (Exhibit 12 of Manire Deposition). The letter is not dated nor signed by anyone.  We have no idea when this letter was generated or moreover who generated the letter.  Meadow did not send a letter to Manire that his loan approval was withdrawn.  Meadow did not know if a letter was even sent to Manire (Dep tr Meadow, P 11).

Accordingly Counts IV states genuine issues of material fact as to the existence of an essential element of Plaintiff's case and Defendant's Motion for Summary Judgment should be denied.

## CONCLUSION

Based on the foregoing, this Court should deny Defendant's Motion for Summary Judgment pursuant to Rule 56 and set this matter for trial as there exists genuine issues of material fact.

Respectfully submitted,

UAW LEGAL SERVICES PLAN
By: SEQUARA M. HENRY (P65526)
30500 VAN DYKE, SUITE 700
WARREN, MI 48093
(586) 574-4400

## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GEORGE MANIRE,

     Plaintiff

-vs-                                   CASE NO. 04-60278

AMERICAN EQUITY MORTGAGE          JUDGE: MARIANNE O. BATTANI

     Defendant

_____/

SEQUARA M. HENRY  (P65526)
Attorney for Plaintiff
30500 Van Dyke, Suite 700
Warren, Michigan 48093
(586) 574-4400

J. BENJAMIN DOLAN (P47839)
Attorney for Defendant
38525 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7535

_____/

# FILED

## JUL 1 1 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

## EXHIBIT A TO SUPPORT PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

## UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GEORGE MANIRE,

      Plaintiff

-vs-                          CASE NO. 04-60278

AMERICAN EQUITY MORTGAGE      JUDGE: MARIANNE O. BATTANI

      Defendant

                           /

SEQUARA M. HENRY  (P65526)
Attorney for Plaintiff
30500 Van Dyke, Suite 700
Warren, Michigan 48093
(586) 574-4400

J. BENJAMIN DOLAN (P47839)
Attorney for Defendant
38525 Woodward Ave., Suite 2000
Bloomfield Hills, MI 48304
(248) 433-7535

                           /

## **INDEX OF EXHIBITS**

1.  Deposition Transcript of George Manire and Exhibits.

2.  Deposition transcript of Morris Wilson.

3.  Deposition transcript of Eric Meadow.

# FILED

### JUL 1 1 2005

CLERK'S OFFICE
U.S. DISTRICT COURT
ANN ARBOR, MI

1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                      SOUTHERN DIVISION

4

5    GEORGE MANIRE,

6

7                      Plaintiff,

8

9        vs                Case No. 04-60278

10                         Hon. Marianne O. Battani

11   AMERICAN EQUITY MORTGAGE,

12   a foreign corporation,

13

14                      Defendant.

15   _____/

16

17   DEPONENT:    GEORGE MANIRE

18   DATE:        Wednesday, May 25, 2005

19   TIME:        1:05 p.m.

20   LOCATION:    38525 Woodward Avenue, Suite 2000

21                Bloomfield Hills, Michigan

22   REPORTER:    Denise M. Kizy, RPR/CRR/CSR-2466

23

24

25

**2**

1   APPEARANCES:
2
3   UAW-GM LEGAL SERVICES PLAN
4   By: Ms. Sequara M. Henry
5   30500 Van Dyke, Suite 700
6   Warren, Michigan 48093
7   (586) 574-4400
8       Appearing on behalf of the Plaintiff
9
10  DICKINSON WRIGHT, PLLC
11  By: Mr. J. Benjamin Dolan
12  38525 Woodward Avenue, Suite 2000
13  Bloomfield Hills, Michigan 48304
14  (248) 433-7200
15      Appearing on behalf of the Defendant
16
17
18
19
20
21
22
23
24
25

**4**

1               Bloomfield Hills, Michigan
2               Wednesday, May 25, 2005
3               At about 1:05 p.m.
4                   *   *   *
5
6               GEORGE MANIRE
7   was thereupon called as a witness herein, and after
8   having first been duly sworn to tell the truth, the
9   whole truth, and nothing but the truth, was examined
10  and testified as follows:
11              EXAMINATION
12  BY MR. DOLAN:
13      Q.  Please state your full name for the record.
14      A.  George Manire.
15      Q.  Can you spell the last name?
16      A.  M-a-n-i-r-e.
17      Q.  Can you give me a brief description of your
18  educational background?
19      A.  My educational background is tech. I'm a
20  journeyman in boilers, air-conditioning.
21      Q.  Go back to the first thing you said.
22      A.  Boilers, air-condition, heating and
23  cooling.
24      Q.  And what education do you have?
25      A.  I'm a power plant operator at Chrysler's.

**3**

1           TABLE OF CONTENTS
2   WITNESS                         PAGE
3   GEORGE MANIRE
4
5   EXAMINATION BY:
6   MR. DOLAN                        4
7
8
9           EXHIBITS
10                              PAGE
11  No. 1               10
12  No. 2               15
13  No. 3               24
14  No. 4               35
15  No. 5               39
16  No. 6               41
17  No. 7               48
18  No. 8               53
19  No. 9               65
20  No. 10              69
21  No. 11              70
22  No. 12              76
23
24
25

**5**

1   My education is four years of tech. Licensed
2   operator; air-conditioning, refrigeration, boilers.
3   The thing that comes out of the holes right here.
4       Q.  My confusion is what does tech mean?
5       A.  I'm a technician. I'm a repairman. I'm a
6   journeyman. I'm classified as a journeyman.
7       Q.  Do you have a high school education then?
8       A.  Yes, I do.
9       Q.  And you're saying you took post-high school
10  classes, for lack of a better word?
11      A.  I didn't take post-high school. I have
12  four years of technical training, okay, at colleges
13  and tech schools.
14      Q.  And what I'm asking you is what are those
15  colleges and what are those tech schools?
16      A.  Tech schools, Lincoln Electric was my
17  welding. Local 547 operations, that's my license in
18  boilers and refrigeration.
19      Q.  Any other education?
20      A.  No.
21      Q.  You work at Chrysler; is that right?
22      A.  Yes, I do.
23      Q.  How long have you worked at Chrysler?
24      A.  I worked there five years.
25      Q.  Before that where did you work?

**6**

1     A.  I worked at Eastland Center as an operator.
2     Q.  Operator of what?
3     A.  The heating and cooling systems.  That's
4  what I operate.  I operate the heating and cooling
5  systems in malls and buildings.
6     Q.  Mr. Manire, you have to be patient with me.
7  I don't know your personal history.
8     A.  Well, I'm just telling you, heating and
9  cooling.
10    Q.  I know, but when you use the word operator,
11  I don't have any idea what that means.  You do
12  because you work in the industry.  I don't.
13    A.  Well, what do you think operation means?
14  Operation means that I operate the power plant
15  equipment that's in the building.
16    Q.  Okay.  My experience with the word
17  operation means a ton of different things.  I'm just
18  asking you in your personal experience what it means
19  to you.  I'm asking you to explain it so that I
20  understand.
21    A.  And what does this have to do with?
22      MS. HENRY:  Can we take a break for
23  one second?
24      MR. DOLAN:  Yeah, sure.
25      (Brief recess.)

**7**

1      THE WITNESS:  Okay.  Power plant
2  operator.
3  BY MR. DOLAN:
4     Q.  What is your title at Chrysler, if you have
5  one?
6     A.  Power plant operator.
7     Q.  I thought -- I was asking about prior to
8  that.
9     A.  Prior to what?
10    Q.  The five years at Chrysler.
11    A.  My five years at Chrysler's I was a power
12  plant operator.  I was hired in there.
13    Q.  Before that?
14    A.  I worked at Eastland Center.
15    Q.  I just want to draw your attention to
16  January of 2004.
17      You called American Equity Mortgage to
18  refinance your loan?
19    A.  No, I called them for information.
20    Q.  Okay.  You called them for information?
21    A.  Mm-hmm.
22    Q.  Do you remember when you called them?
23    A.  I'd say probably second week, third week in
24  January.
25    Q.  How did you learn about American Equity

**8**

1  Mortgage?
2     A.  I heard it on the radio that I could get a
3  six-point-something loan with semi-good credit and
4  that was advertised.
5     Q.  When you called, were you directed to
6  Morris Wilson or did he answer the phone or how did
7  you get to Morris Wilson?
8     A.  I was directed to Morris Wilson, right.
9     Q.  And did you actually speak with him on the
10  phone the first time you called?
11    A.  Yes.
12    Q.  And what was the substance of that
13  conversation?
14    A.  Well, it was a conversation of I was
15  looking to get refinanced.  I was just testing the
16  waters to see what you can come up with, you know,
17  and that's pretty much it.
18    Q.  You had an existing mortgage on your home?
19    A.  With National City, mm-hmm.
20    Q.  With National City?
21    A.  Mm-hmm.
22      MS. HENRY:  Yes?
23      THE WITNESS:  Yes.
24  BY MR. DOLAN:
25    Q.  And you had no problems with that mortgage,

**9**

1  you were just looking what could you get to refinance
2  at the time?
3     A.  Exactly right.  I had no problems with that
4  mortgage, exactly right.
5     Q.  And it's my understanding that from the
6  documents that that mortgage was at about a principal
7  balance of $130,000 in January of 2004 at an 8.3
8  percent loan?
9     A.  That's correct.
10    Q.  At some point you met with Mr. Wilson at
11  the American Equity Mortgage office in Southfield; is
12  that correct?
13    A.  That's correct, yes.
14    Q.  Did you meet with anyone else there or just
15  Mr. Wilson?
16    A.  Just Mr. Wilson, that's all.
17    Q.  And my records show it was January 13th or
18  14th of 2004?
19    A.  That's about right.
20    Q.  And do you remember -- well, tell me about
21  that meeting that day.
22    A.  Oh, at the meeting I just -- when I was
23  talking to him on the phone he told me what to bring
24  in, you know, submit my paycheck stubs and bring in,
25  you know, the documentation.

**10**

1  Q. For that first meeting?

2  A. For that first meeting, yes, and I was

3  signing papers that would okay for him to --

4  (Brief delay.)

5  Q. You were saying at that first meeting I was

6  signing papers that would okay for him to --

7  A. Right, look into my mortgage that would

8  okay -- that would release the paperwork for whatever

9  information he needed.

10  Q. Let me just, so there's no confusion --

11  A. Sure.

12  Q. Take a look and I'm just going to mark this

13  whole thing as Exhibit 1 to your deposition.

14  (Marked for identification Deposition

15  Exhibit No. 1.)

16  Q. First of all, if you want to just thumb

17  through those documents and see if those are the

18  documents you're talking about then I'll ask you at

19  the bottom if those are your --

20  A. You really want me to sit here and read all

21  this now?

22  Q. No, just thumb through it.

23  A. Well, I've already gotten into this

24  position right now because I've just thumbed through

25  it.

**11**

1  Q. Just to see if you recognize the documents.

2  I'm not asking you to read through them.

3  A. You got to understand this is how I got

4  myself in trouble already, signing something that

5  somebody told me to sign.

6  Yeah, this is my signature. These are

7  the documents I signed.

8  Q. And they all look to be dated January 13,

9  '04. I don't know if that refreshes your memory or

10  not, but that's when they're dated.

11  A. It was in January.

12  Now these are the closing statements?

13  Q. I'm sorry?

14  A. Are these the closing -- these are the

15  closing, at the closing?

16  Q. No, these are dated -- no, I'm asking you

17  if those are the ones you signed at that first

18  meeting with Morris Wilson?

19  A. No, no, no, these weren't the first ones

20  that I signed with Morris Wilson, no. I signed a

21  quick one, two, and he took and got all that

22  information. This is the closing.

23  Q. Those are all dated 1-13-04. Look at the

24  dates.

25  A. Isn't this the closing? Unless it's

**12**

1  together, that might be my mistake.

2  Yeah, okay, the application, you could

3  say that I okayed it at that date for him to see if I

4  preapproved or, yeah, you know, look into my

5  documents. I mean that's pretty standard.

6  Q. Okay. I know, but I'm confused now.

7  A. Yeah, I'm confused also. Go ahead.

8  Q. Those are all dated 1-13-04?

9  A. Yeah.

10  Q. And that's your handwriting. Am I wrong?

11  A. No, you're right.

12  Q. You would have dated it the date you signed

13  it?

14  A. Yeah, but you're telling me this is -- when

15  I came in and my first run-in with Mr. Wilson, I

16  signed a release for him to look into the

17  information. That wasn't a closing. Everything

18  didn't happen like one day, no.

19  Q. No, no, exactly, no, and those are not --

20  A. I met with Morris, okay, and I signed the

21  document that would release the information that he

22  could get. I gave him my social security number, I

23  gave him all the information.

24  Q. You're saying you didn't sign those

25  documents at that first time you met with him?

**13**

1  A. No, no, I didn't sign these. These are my

2  closing documents or something, no. The first --

3  when I first met Morris Wilson why would I close

4  immediately right now?

5  Q. I'm not even suggesting you did that.

6  A. Well, no, these are my closing -- these are

7  my closing documents. No. What I did with Morris,

8  like I told you, I went in there, I signed release

9  forms that would release the information. I didn't

10  sign anything that would obligate me to -- no, no,

11  and then he was supposed to get back with me.

12  Q. Right, and I understand all that, and I'm

13  not disputing any of what you just said.

14  A. Okay.

15  Q. At all. It was my understanding that those

16  were the documents that allowed him to do all of

17  that.

18  A. Are they? I'm thinking that they're the

19  closing because I didn't sign this many documents at

20  the -- who would sign this many documents right when

21  we're trying to, you know, be approved?

22  Q. Well, let's just take a look at them real

23  quick.

24  A. What I signed was just something quick,

25  something for release, that's all. They might be

**14**

1 together. I don't know.
2    Q. I'm just going to go through them
3 individually and ask you if you have any memory.
4       The first one is entitled Uniform
5 Residential Loan Application, okay.
6       Maybe I should be more clear. I'm not
7 asking you to test your memory. If you look at a
8 document and I say do you recognize it or remember
9 signing it, your answer might be no, I don't, and
10 that's fine.
11       By asking you if you see a document,
12 I'm not suggesting to you anything, you know, I mean
13 whether you've seen it or not. I'm just literally
14 asking have you seen this, do you remember it or not,
15 and the only reason I'm asking you that at least with
16 these particular documents is because somebody signed
17 them saying, you know, your signature, at least it
18 says George Manire, I don't know if it's your
19 signature or not, I've never seen it before in my
20 life, with a date of 1-13-04, which is when I
21 understand the first meeting with Morris Wilson was.
22    A. It might not have been that.
23    Q. Right, and maybe you don't remember and
24 maybe you do.
25    A. Right. It might have been two weeks prior

**15**

1 to that. The closing might have been 1-13.
2    Q. Well, I'm going to get to the closing.
3    A. Okay.
4    Q. I'm suggesting to you that I think these
5 were signed at the first meeting. You may or may not
6 be able to tell me one way or the other, and again
7 I'm not trying to test your memory, just if you do
8 remember, great. If you don't, you don't.
9    A. No, I don't remember. I don't remember
10 signing that many. I remember signing a release
11 form, just something quick, whatever the standard
12 procedure is. I don't know, you know.
13    Q. Okay.
14    A. This is what I wanted to go to a loan
15 officer for, see.
16    Q. Let's do it this way. Let me give you a
17 couple other documents, which I'm going to clump
18 together as Exhibit 2 just because I don't want to
19 have too many documents out there at the same time.
20       (Marked for identification Deposition
21       Exhibit No. 2.)
22    Q. If you take a look at Exhibit 2, there are
23 three documents there. The first one is entitled
24 Owner's Affidavit.
25       Is that your signature at the bottom

**16**

1 of that document?
2    A. Yes. Yes, it is.
3    Q. And it does say Owner's Affidavit at the
4 top?
5    A. Yeah.
6    Q. And it's dated what date, can you tell from
7 that document at the bottom there?
8    A. 29th of January.
9    Q. Flip to the second document which is I
10 think -- what's that entitled?
11    A. Exhibit A.
12    Q. Okay. Keep going to the next page, please.
13    A. Note.
14    Q. Okay. Do you recall seeing -- if you go to
15 the fourth page of that document -- or the third
16 page, I'm sorry, is that your signature there?
17    A. My initials, yeah.
18    Q. No, the third page.
19    A. Yeah, that's mine, yeah. Yes.
20    Q. And this Note is dated January 29, 2004,
21 the first page of it?
22    A. Yep, 29th.
23    Q. And the fourth page, which is really
24 another document, Prepayment Note Addendum, the next
25 page after your signature page, do you see that?

**17**

1    A. Yes.
2    Q. And that's also your signature?
3    A. Yes.
4    Q. And that's dated January 29, 2004 at the
5 top?
6    A. There's no date on it. Oh, yeah, I'm
7 sorry, yeah.
8    Q. First paragraph there?
9    A. Yes.
10    Q. And then the next page is called Allonge to
11 Note which is -- I don't know if it's dated or not,
12 frankly.
13    A. Yes, it's dated, 29th.
14    Q. All right. And then the next document is
15 the mortgage, is that correct, after that?
16       Why don't you flip all the way to page
17 15 of 15. Go 14 of 15.
18    A. Yeah.
19    Q. Is that your signature there?
20    A. Yes.
21    Q. And then the next page, 15 of 15, it says:
22       The foregoing instrument was
23 acknowledged before me this January 29, 2004, by you.
24       Is that correct and accurate, what I
25 just said?

5 (Pages 14 to 17)

**18**

1    A. Yes.

2    Q. Do you understand that these are, not all

3    of, but some of the documents signed on January 29,

4    2004, the closing date in this original loan?

5    A. That's my closing, mm-hmm.

6    Q. And that the agreement between you and

7    American Equity Mortgage to repay the amount of money

8    they were financing to refinance your property is the

9    note which is Exhibit 2?

10    A. Is the note, mm-hmm.

11    Q. And the mortgage which is part of Exhibit 2

12    is what you gave to secure, you know, to insure

13    payment of that note?

14    A. My signature.

15    Q. On the mortgage?

16    A. Yeah.

17    Q. So just for clarification, going back to

18    Exhibit 1, which is signed on the 13th of January, 16

19    days earlier, those were not the closing documents?

20    A. No.

21    Q. And whether or not you recall signing them

22    specifically at all, you agree that those documents

23    are signed by you?

24    A. Yes.

25    Q. And dated by you?

**19**

1    A. Yes.

2    Q. And you have no reason to believe that you

3    dated them a different date from the day you signed

4    them?

5    A. No, no. Why would I?

6    Q. I have no idea, and that's why I simply

7    asked it as sort of matter of factly because I assume

8    you wouldn't.

9        Going back to that first meeting with

10    Morris Wilson, which we're going to assume was on the

11    13th, can you recall what Mr. Wilson said to you

12    about the loan?

13    A. What Mr. Wilson did was this:

14        He had me sign the papers to release

15    everything, okay. Before I went down there to even

16    sign the papers, he had contacted me on the phone and

17    told me, well, I got a deal or I want to write you a

18    loan or whatever, and I told him, I says I can't go

19    from an 8.3 to an 8 anything, I need two points, and

20    he told me, come on down, we'll take care of you.

21        I come down there, I sign the papers

22    because he's going to give me a good deal, okay, or a

23    good mortgage I should say.

24    Q. Anything else that he said to you?

25    A. Yes, he told me that within six months I

**20**

1    would get a two-point drop.  If I had good payments

2    and I sustained six months of good payments, I would

3    get a two-point drop off my mortgage.  That's what

4    Mr. Wilson told me face up, man-to-man.

5    Q. At the meeting on the 13th?

6    A. Yes.

7    Q. Anything else you're saying Mr. Wilson said

8    to you that day?

9    A. No, that's pretty much it.  He told me that

10    if I signed with this mortgage or this payment right

11    here of 8.0, that within six months he would give me

12    a two-point drop on my mortgage.  That's the only way

13    I would sign.

14    Q. Was that --

15    A. It was a gentleman's agreement.

16    Q. It wasn't in a letter anywhere?

17    A. No, it wasn't anywhere.  Why should it be?

18    I mean he's my loan officer.  He's telling me that

19    they have a program.  I said you have a program, huh?

20    I need financial advice, so if you have a program,

21    could you give me some financial advice?  Sure, you

22    know.  Once you're six months in this program, we'll

23    give you a two-point drop after that if you have six

24    months of good payments.  That's what Mr. Wilson told

25    me.

**21**

1    Q. All right.

2    A. And that's a gentleman's agreement.  It was

3    just something that a loan officer to a client told

4    me.  Now if he didn't have this program, then I would

5    have never signed.

6    Q. All right.  What I'm asking you was there

7    anything given to you in writing that established

8    that program?

9    A. No, there wasn't.  It was a gentleman's

10    agreement.  It was a loan officer's confidentiality

11    with another client.  I mean isn't there some kind of

12    substance there?  Do I have to assume everybody is

13    lying to me?

14        Why would it be hard for me to believe

15    or even you to believe that a corporation that has

16    billions of dollars or millions of dollars, big

17    corporation like American Equity, doesn't have a

18    program?  Anybody would believe that.  I would

19    believe it.  And he says well, for the semi -- I says

20    in order for me to make it profitable for me to

21    refinance I need at least a two-point drop.

22    Q. Why did you say that to him?

23    A. Because that's what I would need.

24    Q. Why do you believe that?

25    A. Well, I believe that simply because the

22

1 National City that had my mortgage before told me
2 that within a year I could get refinanced.
3   Q.   Okay.
4   A.   Okay.  So that's when I went to Morris
5 Wilson.
6   Q.   Why didn't you go back to National City, or
7 did you?
8   A.   I did, yeah.
9   Q.   And what did they say?
10   A.   They said we're not going to approve it.
11 You know, we'll just carry it on from 8.3.
12   Q.   So they wouldn't reduce your rate?
13   A.   No, they wouldn't reduce it.
14   Q.   Had they promised you that they would?
15   A.   Yes.
16   Q.   Did you complain to them about not
17 refinancing?
18   A.   Sure, sure.
19   Q.   Did you?
20   A.   Sure.  What am I going to do?
21   Q.   I don't know.  What did they say?
22   A.   They just said no, we're not going to
23 finance you at this time, you know.  If they wanted
24 to carry it on another year or if they wanted to do
25 this or whatever their excuse was, they weren't going

23

1 to refinance from an 8.3 to anything.
2   Q.   To anything?
3   A.   Right, right, and that's when I wanted to
4 get financial help, so I went to Morris Wilson.
5   Q.   But going back to my original question, I'm
6 just curious why you thought you needed the two-point
7 drop as opposed to a one-point or half-point or
8 one-and-a-half points?
9   A.   Because it would have taken my mortgage,
10 the way it is now, I would have to spend more money.
11 Why would I go 3/10ths of one percent, go from a 130
12 at 8 percent, at 8.3, to a 144 at 8.0, why I would do
13 that?
14   Q.   I think you misunderstood my question.
15       I'm just wondering why it was you had
16 to have two points versus one and a third?
17   A.   It was just a round figure.
18   Q.   So you were not hard and fast set on the
19 two points?
20   A.   No, no.  No, I wasn't set, no.
21   Q.   And so without reading through these
22 documents, you're not saying that in -- I'm wondering
23 where they went.  Oh, there they are.
24       Exhibit 2, which is the Owner's
25 Affidavit, the Note and the Mortgage, you're saying

24

1 yes, all of that has 8.0 in it as a rate for your
2 loan?
3   A.   Mm-hmm.
4   Q.   And you understood that at the time you
5 closed this loan?
6   A.   Right, right.
7   Q.   Okay.
8   A.   And I was also told if I carry that 8.0 for
9 six months with good payments I would get a drop and
10 reduction.
11   Q.   Okay.  And you knew at the time, though,
12 that it was $144,000 versus $130,000 principal
13 balance?
14   A.   Sure.
15       MR. DOLAN:  You know, I apologize.
16 Can we go off for 10 seconds?
17       (Brief recess.)
18       MR. DOLAN:  I want to mark this
19 Exhibit 3.
20       (Marked for identification Deposition
21       Exhibit No. 3.)
22 BY MR. DOLAN:
23   Q.   Take a look at that two-page document which
24 we've marked as Exhibit 3 and tell me if you
25 recognize it or have ever seen it before?

25

1   A.   Yeah, that's my writing.
2   Q.   Look at page two.
3       Is that your signature there?
4   A.   Yes.
5   Q.   And briefly just review that document, and
6 take as much time as you want.
7   A.   Okay.
8   Q.   What do you understand that document to be?
9   A.   I understand this document to be things
10 that I wanted, things that I wanted done on my
11 mortgage.  That's what I -- that's why I wrote down
12 here those are the things that I wanted done.
13   Q.   Okay.
14   A.   These are the things as a consumer that I
15 demanded having done:  Pay off a credit card, lower
16 payment, and personalized service.
17   Q.   All right.  That's in your handwriting,
18 those three things?
19   A.   Yeah, mm-hmm.
20   Q.   And the date next to the signature is
21 1-29-04; is that correct?
22   A.   Yes.
23   Q.   And what's the title of the document?
24   A.   Borrower(s) Certificate of Reasonable
25 Tangible Net Benefit.

52

26

1    Q. And you understood that before you signed
2 it at the closing?
3    A. That it's what? That's it's a Certificate
4 of Reasonable Tangible Net Benefit. That's what I
5 wanted done.
6    Q. Well, turn to the second page. Above your
7 signature there's a paragraph in block capital
8 letters.
9       Do you recall reading that?
10    A. Yeah, okay.
11    Q. And by signing that you were agreeing to
12 that?
13    A. I was agreeing to what I wrote down here:
14 Pay off credit cards, lower my payment and
15 personalized service. That's what I'm signing here.
16    Q. Well, actually read the paragraph above
17 your signature. Go ahead and read it out loud, would
18 you?
19    A. No, but I didn't read this, the whole
20 document. This was kind of the same cluster of
21 these, sign here, sign here, sign here. Hey, sign
22 here, sign here, sign here, sign here. That's what
23 pretty much it amounts to. So I don't read every
24 little peck, ever little speck, all of these
25 documents.

28

1    Q. Well, if he told you to sign a note that
2 was for $500,000, would you have signed it?
3    A. I probably would. He's the loan officer.
4 Isn't there any integrity in his office, in his
5 title?
6    Q. Isn't there any obligation for you to read
7 something before you sign it?
8    A. There is, and I put down what I signed.
9 What I wanted was that and he told me to sign it.
10 What do you want? I want that.
11    Q. And all I'm asking you if it was true and
12 accurate, which is what this paragraph says?
13    A. I did not read it.
14    Q. I'm asking you today, did you read it
15 today?
16    A. No.
17    Q. When I handed it to you and asked you to
18 read it, you sat there and looked at it?
19    A. Yeah. In fact, give me all the papers and
20 I'll read all the papers right now, okay.
21    Q. You can do that if that's what you want,
22 but all I asked you to do is read that paragraph, and
23 you looked like you were reading it. Maybe you
24 weren't.
25    A. I read the paragraph.

27

1    Q. I'm not asking if you read every speck or
2 every document. I'm asking you for the block,
3 capital, bolded language above your signature. It
4 says: Important note to borrowers. Do not sign this
5 document until you read it carefully and understand
6 it.
7    A. I signed it in front of Morris Wilson.
8    Q. It says: Do not sign this document unless
9 the statements made by you are true.
10    A. Yes.
11    Q. Your signature below means that you have
12 read and understand this document, and that the
13 statements made by you in this document are true and
14 correct.
15    A. I didn't read the document, no, I did not
16 read the whole document. It was in with a bunch of
17 other papers. So I put down there what I wanted, and
18 he told me to sign it, so I signed it. He's my loan
19 officer. He's taken me through the jungle of
20 corporate financing. I'm not, okay. I'm a consumer.
21 Let's get that clear.
22    Q. I understand that.
23    A. Okay. Don't ask me questions always on
24 this and that, and this and that, and this and that,
25 because he's telling me to sign it.

29

1    Q. Do you agree with it?
2    A. No.
3    Q. What's inaccurate about it?
4    A. What's inaccurate about it is that doesn't
5 apply to what I wrote down there. What I wrote down
6 there is what my signature applies to. Pay off
7 credit card. These are consumer assets, so to speak.
8 This is why I get refinance is because I wanted to
9 pay off a credit card. No, I didn't understand that
10 document. If it's going to be that much of a turning
11 point in this case, no, I don't understand that
12 document. I understood what I wrote down there. You
13 see what I wrote down?
14    Q. Yes.
15    A. Okay. That's what I signed, what I wrote
16 down.
17    Q. These are the benefits you were receiving
18 from the loan?
19    A. That's what the benefits I was supposed to
20 receive from the loan.
21    Q. Okay. Any others, other than what you
22 wrote down there?
23    A. Any other what?
24    Q. Benefits that you expected to receive from
25 this loan other than those.

8 (Pages 26 to 29)

F

## 30

1    A. Yes, I expected after six months to receive
2    a discount of two points off my -- off the interest.
3    Q. But you didn't write that down there?
4    A. No, because that was part of his
5    consulting. You know what, if you get somebody that
6    is a consultant, he's supposed to tell you the truth,
7    he's supposed to lead you in the right direction.
8    Q. What leads you to believe that Mr. Wilson
9    was a consultant and not a loan officer?
10   A. Well, what's the difference? He's
11   consulting me on a loan; isn't he?
12   Q. I didn't use the word consultant.
13   A. Don't nitpick with me with the little
14   words. He consulted me as a financing officer. Now
15   what don't you understand about consulting?
16   Q. I don't understand why you thought he was a
17   consultant of any kind.
18   A. From American Equity Mortgage he's the one
19   that answered the phone, so he must have some kind of
20   a consulting counselor.
21   Q. Did he say that's what he was? Did he give
22   you a card that says that's what he was?
23   A. Well, what do you think a loan officer is?
24   Is a loan officer a consultant?
25   Q. No.

## 31

1    A. No? Well, what is a loan officer then? Is
2    a loan officer just somebody that says sign here,
3    sign here, sign here, sign here, sign here; is that
4    what a loan officer is?
5    Q. No.
6    A. Well, what is a loan officer then?
7    Q. I think Mr. Wilson testified this morning
8    as to what that is.
9    A. Well, then why are you asking me?
10   Q. I'm asking you because you called him a
11   consultant.
12   A. I don't understand your question.
13   Q. The question is why did you think he was a
14   consultant instead of a loan officer?
15   A. Because he's a loan officer. Isn't a loan
16   officer a consultant? Doesn't he consult you in the
17   figures, in the market? Isn't he a broker? Is he a
18   broker? Isn't a broker supposed to tell you what's
19   the best path to take?
20   Q. Well, I guess I'm not sure what you're --
21   how you're using the term broker.
22   A. Is he a broker?
23   Q. Mr. Wilson testified this morning he's a
24   loan officer; right? You were there.
25   A. Yeah, but is he a broker?

## 32

1    Q. Did he say he was a broker this morning?
2    A. Is he a broker if he's a loan officer?
3    Q. What I think is irrelevant. I'm just a
4    lawyer asking questions at a deposition.
5    A. Okay.
6    Q. It's inappropriate for me --
7    A. Me as a consumer and not knowing
8    everything, okay, ignorance, I'm looking to him as
9    being a consultant or a counselor, that's what I'm
10   looking at a loan officer as being. I don't look at
11   a loan officer as somebody that just says, oh, sign
12   here, sign here, sign here, sign here, sign here.
13         If the guy is answering -- I wanted a
14   loan, all right. He's supposed to lead me in
15   financial, you know, bliss, so to speak, and he
16   didn't. That's the bottom line. Now as far as a
17   consultant, yeah, the consumer would think that a
18   loan officer is a consultant or a counselor or
19   somebody that's going to give you advice.
20   Q. But he never said he was a consultant or
21   counselor or was giving you --
22   A. No, no, I assumed as a consumer that a loan
23   officer is going to show me the path to better
24   financing, okay.
25   Q. And that that relieves you -- strike that.

## 33

1          Do you agree that the loan that you
2    entered into on the 29th of January 2004 was for an
3    interest rate of 8.0 percent?
4    A. Did I realize that?
5    Q. Yes.
6    A. Yes, I did.
7    Q. And you don't dispute that today?
8    A. No.
9    Q. Do you agree that you paid off credit card
10   debt with proceeds from the loan?
11   A. Yes, but I want it also said on the record
12   that it was a convenience, it wasn't a necessity. I
13   had the money in the bank to pay off the credit card.
14   It was a convenience that I put it on my mortgage.
15   It wasn't something that, oh, they're on me, no.
16   Q. No, but you received almost 4,000 --
17   $3,900?
18   A. Sure, I had that in the bank. It's a drop
19   in the bucket. Why would I refinance for $4,000 on
20   my credit card, buddy? Why would I do that? Look at
21   the figures.
22   Q. All I'm trying to find out is whether you
23   received the 4,000 to pay off the credit card from
24   American Equity Mortgage?
25   A. Yes, yes, that's their job. That's their

9 (Pages 30 to 33)

**34**

1  job is to consolidate loans; isn't it?

2      Q.  You also put on Exhibit 3, the borrower's

3  certificate, lower payment.

4          Your payment was lowered by about $47;

5  is that correct?

6      A.  When do you want me to laugh, now or later?

7  Yeah, it was $45.  It was $12.50 a week.  Look at the

8  figures.

9      Q.  I understand.

10     A.  Would you sign that?  Would you sign if I

11  told you that, hey, I got $45 savings for you and I

12  want you to have your loan go from 130 to 144 to pay

13  off a $4,000 credit card.  Does that sound like good

14  consulting?

15     Q.  All I want to know is whether your payment

16  was lower.

17     A.  Oh, yeah, you don't want to talk.  What do

18  you want to do?

19     Q.  I just want to know if your payment was

20  lower.

21     A.  Yeah, $45.  It wasn't lower.  It was

22  promised to be lower after six months.

23     Q.  When was it promised-- oh, based on the

24  earlier statements, nothing more than what you said

25  before?

**35**

1      A.  What's that?

2      Q.  This isn't something new; right?

3          I asked you before what Mr. Wilson

4  said to you on the 13th of January, and you told me

5  everything.  I asked you is that all and you said

6  yes.

7          You're not bringing something new up

8  now; are you?

9      A.  About what?

10     Q.  About anything.

11     A.  No, there's nothing new.

12     Q.  He didn't make any promises to you on

13  January 29th?

14     A.  The promise he told me that I would have a

15  two-point reduction if six months of good payments.

16     Q.  All I'm asking you, did he say anything

17  else beside that, over and above that, on the 29th of

18  January?

19     A.  Pertaining to what specific piece of paper?

20     Q.  Any promise to you of any kind in addition

21  to what you just stated.

22     A.  No.

23         MR. DOLAN:  Mark that as 4.

24         (Marked for identification Deposition

25         Exhibit No. 4.)

**36**

1  BY MR. DOLAN:

2      Q.  Mr. Manire, will you take a look at Exhibit

3  4 and tell me if you've ever seen that document

4  before?

5      A.  Mm-hmm, yeah, this is the letter that they

6  sent me once I realized that American Equity sold my

7  mortgage.

8      Q.  It's a letter dated March 5th of 2004?

9      A.  Yeah.

10     Q.  About a month and a few days after the

11  closing?

12     A.  Right.  That I was not informed all that

13  time about them selling my mortgage at all, period.

14  Never informed.

15     Q.  Informed that it was going to be or that it

16  had been?

17     A.  That it was going to be.  If the guy told

18  me they had a program, why would I assume that

19  they're going to sell my mortgage?

20     Q.  The letter that is Exhibit 4 is from New

21  Century Mortgage Corporation; correct?

22     A.  Right.

23     Q.  It advises you that they're the owners of

24  your loan?

25     A.  Right.

**37**

1      Q.  And your first payment is due April 1st?

2      A.  Right.

3      Q.  And it puts the amount of the payment;

4  correct?

5      A.  Right.

6      Q.  Did you respond to that letter in any way?

7      A.  Oh, yeah.

8      Q.  To whom?

9      A.  I responded to New Century Mortgage.

10     Q.  How?

11     A.  And I told them that the contract that --

12  no, first I called them up and I says, okay, you

13  bought my mortgage.  They said yeah, correct.  I

14  says, okay, you must know about the program American

15  Equity has.  What program?

16     Q.  Who did you talk to?

17     A.  I can't remember the woman's name.  I can

18  get it, though.  Because, see, this is in California,

19  and how am I going to know exactly who I'm talking to

20  when I call up there about it?  I talked to a

21  counselor, then they give me another counselor.  I

22  don't know everybody's name, but I can get the

23  woman's name that I talked to.

24         So I talked to her, and I says, well,

25  you must be part of the program that American Equity

**10 (Pages 34 to 37)**

Esquire Deposition Services, LLC
(800) 866-5560

**38**

1  has, you know, and she goes we don't have any idea
2  about the program.
3       I explained it to her, and she says
4  no, no, we just bought the contract. There's no
5  program or no reduction or nothing. So all those
6  things that Morris Wilson told me for me to sign from
7  an 8.3 to an 8.0, from 130 to 144, were all lies.
8       Q.  Is that the first conversation you had with
9  anybody at New Century?
10      A.  Yes, yes, that was the very first.
11      Q.  How long after getting this letter was that
12  conversation; days, weeks?
13      A.  Oh, man, it was right away. It was right
14  away.
15      Q.  So within a couple days, a day or couple
16  days?
17      A.  Sure, sure, and I have that documented also
18  is because they responded and asked me what happened
19  to the correspondence because when I wrote them a
20  letter saying about the mortgage, they wrote me a
21  letter back saying, well, why didn't you respond to,
22  you know, our inquiries about it, and I told them, I
23  says, well, you told me that you can't do anything
24  about it, so that's why I didn't respond back there,
25  but the letter I have dated on there, it is quite

**39**

1  close to when I found out that they sold my mortgage.
2       MR. DOLAN:  Mark that as 5.
3       (Marked for identification Deposition
4       Exhibit No. 5.)
5  BY MR. DOLAN:
6       Q.  Will you take a look at what's been marked
7  as Exhibit 5 to your deposition?
8       A.  Mm-hmm.
9       Q.  Is that your handwriting?
10      A.  Yeah.
11      Q.  That's a six-page document; is that safe to
12  say?
13      A.  It's pretty close to that, sure.
14      Q.  Am I wrong?
15      A.  I'm sorry?
16      Q.  Are there more than six pages?
17      A.  No, I said that was pretty long — I mean,
18  this is about it.
19      Q.  I just want to know if there's more than —
20  if there's anything more, like there's something left
21  out of this document that you recall writing to New
22  Century that should be included in this exhibit.
23      A.  No, this is the letter that I wrote to —
24  yeah, this is a letter I wrote to New Century.
25      Q.  Is this in response to the March 5th letter

**40**

1  they wrote to you and the phone conversation you had
2  with them?
3       A.  I can't remember.
4       Q.  Was there another letter you wrote to them?
5       A.  I'm not sure. I wrote letters to a number
6  of people, you know, as far as New Century, and I
7  wrote one to American Equity, I wrote one to American
8  Equity out of Missouri, so there was about three
9  letters that I wrote or else I copied these and sent
10  them, one of the two.
11      Q.  So you don't recall if this was the letter
12  you wrote after you had the conversation on the phone
13  with New Century that you just described a few
14  minutes ago?
15      A.  Did you get — where did you get — did you
16  get this from New Century?
17      Q.  Yes.
18      A.  So you got this from New Century?
19      Q.  Me personally? I don't know.
20      A.  No, I'm saying I corresponded with New
21  Century and they documented -- they faxed over
22  whatever, this document, over to American Equity.
23      Q.  I don't know how that document got to
24  where --
25      A.  Okay. It's my handwriting. I probably

**41**

1  wrote it. I can't remember if I wrote it -- I might
2  have wrote it after, you know. I probably would have
3  to write it afterwards because I talked to them on
4  the phone, first of all.
5       Q.  Maybe I can give you some documents that
6  will help refresh your memory.
7       MR. DOLAN:  Mark that 6.
8       (Marked for identification Deposition
9       Exhibit No. 6.)
10 BY MR. DOLAN:
11      Q.  Exhibit 6 is a letter from New Century to
12  you acknowledging receipt of your letter of same date
13  which is April 15, 2004.
14      Does that refresh your memory as to
15  when you sent Exhibit 5?
16      A.  This doesn't have anything to do with me.
17  It says Mr. and Mrs. Hampton.
18      Dear Mr. and Mrs. Hampton: Your
19  letter faxed today to the Customer Service Department
20  has been forwarded to --
21      Q.  You're right. I got that from your lawyer
22  this morning. I don't know why I have that then.
23      MS. HENRY:  His name is on the letter,
24  but it says Dear Mr. and Mrs. Hampton.
25 BY MR. DOLAN:

**11 (Pages 38 to 41)**

**42**

1  Q. Is that your address there?
2  A. Yeah, that's my address.
3  Q. So is it possible they made a typographical
4  error concerning who they were addressing it to, the
5  Dear part? At the top it says your name.
6  A. I don't remember faxing anything to -- oh,
7  I see. I think I do remember I did fax something
8  over to New Century, okay.
9  Q. Do you remember faxing that letter that's
10  Exhibit 5 right there on the table, that six-page
11  letter?
12  A. I might have. I can't remember, but I
13  might have. It's been a year and a half.
14  Q. And as I said earlier, it's not a memory
15  test. If the answer is I don't remember, that's a
16  fine answer. That's fine.
17  A. All right. I remember faxing something
18  over to them. Whether it was that letter or not, it
19  might have been because that's the letter that I was
20  mostly, you know, adamant about.
21  Q. Taking a look back at Exhibit 5 which is
22  your letter, not that document, the other letter, the
23  second -- strike that.
24            11 lines up from the bottom.
25  A. On what page.

**43**

1  Q. Page one?
2  A. Okay.
3  Q. It says that he said that six months from
4  closing my credit would be good enough to reevaluate
5  my rate.
6  A. I didn't mean that.
7  Q. And then I would realize savings -- or
8  realize my savings with a lower rate.
9  A. Right. It was the two points that was
10  the --
11  Q. You didn't mean that?
12  A. The reevaluation was the two points. I
13  meant reclosing or refinancing.
14  Q. So you're saying that sentence is
15  inaccurate?
16  A. That sentence is inaccurate, yes, because
17  it should have been refinanced.
18  Q. Go to the second page, five lines up from
19  the bottom -- four lines up from the bottom, I'm
20  sorry: I cannot honor this contract that was signed
21  by me under false promise by American Equity
22  Mortgage.
23            Next page: I will withhold my payment
24  until this matter has been void.
25  A. Right, but I never did any of those things.

**44**

1  Q. You never withheld payment?
2  A. I never withheld payment.
3  Q. You made payment on April 1 to New Century?
4  A. Yes.
5  Q. And May 1?
6  A. I made all my payments.
7  Q. Did you tell anybody at New Century that
8  you didn't mean that?
9  A. Did I tell anybody?
10  Q. Yeah.
11  A. I don't think so.
12  Q. Did you have any follow-up conversations
13  with New Century after writing this letter, telephone
14  conversations?
15  A. No, they never -- well, I can't remember.
16  I can't remember. It's been like I said a year and a
17  half, you know. In fact, yeah, it's been about a
18  year and a half because this happened back in what,
19  March, you know.
20  Q. Well, assuming it was the facts they were
21  referring to in the April 15th letter, it was about
22  one month basically; right?
23  A. I'm always up to par.
24  Q. Okay. All I'm asking is if you -- you said
25  at one point after receiving the March 5th letter you

**45**

1  talked to somebody at New Century, and then you wrote
2  this letter. So you had a phone conversation, a
3  letter, and I'm assuming -- presuming the Exhibit 6 is
4  accurate, it was around April 15th, was there ever
5  another phone conversation with New Century after
6  that?
7  A. No, I don't think so. The only
8  conversation that I had with them was that they told
9  me that they -- I have to honor the contract, so
10  basically, you know, I honored it.
11  Q. And as far as you can recall today, there's
12  no other letter in response to the March 5, '04
13  letter, other than the letter that's sitting there,
14  Exhibit 5, that you either have in your possession or
15  that you remember?
16  A. What? Say that again.
17  Q. Between March 5 of '04 and the date that
18  you sent the letter which is Exhibit 5 to New
19  Century, you do not recall writing any other letters?
20  A. No.
21  Q. To New Century?
22  A. No, I don't recall.
23  Q. And you don't have any in your files at
24  home or that you've given to your attorney?
25  A. No. That I sent them?

12 (Pages 42 to 45)

**46**

1   Q.  Correct.
2   A.  No.  Once they --
3   Q.  I'm sorry, have you finished that sentence?
4   A.  Well, once they told me that they can't do
5  anything for me, I cut off negotiations.  I cut off
6  things with them, contact or whatever.
7   Q.  How did New Century tell you that they
8  couldn't do anything for you?
9   A.  They told me I have to honor.  They don't
10  know anything about the program.  They don't know
11  anything about anything.  They just know that --
12   Q.  And that was in that first phone
13  conversation?
14       In other words, when I said how did
15  they tell you, was it over the telephone during that
16  conversation that you referred to earlier?
17   A.  Yeah, right.
18   Q.  They never wrote you a letter to that
19  effect; is that correct?
20   A.  No, the only letter they wrote me was they
21  wanted to know what happened to the correspondence.
22   Q.  Do you recall receiving a telephone call
23  from Eric Meadow at American Equity Mortgage end of
24  April 2004?
25   A.  Yes, I do.

**47**

1   Q.  Do you recall why Mr. Meadow called you?
2   A.  Because I called him because I couldn't get
3  in touch with Morris Wilson.  Morris Wilson never
4  contacted me again.  I contacted him.  I tried to .
5  contact him.  Left voice mail, everything.
6   Q.  When did you do all that?
7   A.  I had done all that before I went to Eric
8  Meadow.
9   Q.  When is the first time you started doing
10  that?
11   A.  First time was when I found out that he
12  lied and New Century doesn't know anything about
13  my -- the program or anything.
14   Q.  So it was after receiving the March 5th
15  letter when you called New Century, talked to them on
16  the phone as you earlier testified to, you then
17  called Mr. Wilson after that?
18   A.  No, I called Mr. Wilson before that.
19   Q.  You called him before New Century said they
20  didn't know about the program?
21   A.  No, I called him just to talk to him.  I
22  didn't call him just to complain about that.  I
23  complained later.
24   Q.  All right.  So you called him before that
25  about what?

**48**

1   A.  Yeah, about just general stuff, how's it
2  going, you know, blah, blah, blah.
3   Q.  Not anything relating to --
4   A.  Nothing related.  Just to call him and say
5  how it's going, and, you know, that type stuff.
6   Q.  But the first time you called him to talk
7  about the loan --
8   A.  Never talked to him.
9   Q.  You never did?
10   A.  No.
11   Q.  You left messages?
12   A.  Yes.  Never talked to Morris Wilson again.
13  That's why Eric Meadow got involved.
14   Q.  Did you call Eric Meadow or did he call
15  you?
16   A.  I called Eric Meadow.
17   Q.  How did you get his name?
18   A.  I got his because he's the supervisor of
19  Morris Wilson, and so I usually want the supervisor
20  just like a consumer would.
21   Q.  Would you take a look at what's going to be
22  marked Exhibit 7 to your deposition.
23       (Marked for identification Deposition
24       Exhibit No. 7.)
25   Q.  Do you recall receiving this letter which

**49**

1  is dated April 28, 2004, on American Equity Mortgage
2  letterhead, and signed on the second page I'll
3  represent by Amanda Klein, customer service
4  supervisor, two-page exhibit?
5       Do you recall receiving this exhibit
6  on or about April 28 of 2004?
7   A.  No.
8   Q.  It is not this letter which drew your
9  attention --
10   A.  Please see the enclosed first -- no,
11  definitely.
12   Q.  No what?
13   A.  No, I have never seen this, I've never
14  received it.
15   Q.  Do you see the last sentence of the letter
16  on page two where it says, Please feel free to
17  contact Mr. Meadow at 248, and it gives his number,
18  in order to pursue the above mentioned offer?  That's
19  not why you called him?
20   A.  I have never seen this document before.
21  This was never sent to me.  I don't know what this
22  document is.  Don't you think that I would have
23  contacted Eric Meadow?  This document was never sent
24  to me.  Never saw it.
25   Q.  I thought you just testified a minute ago

13 (Pages 46 to 49)

**50**

1  that you did contact Mr. Meadow?
2      A.  I contacted Mr. Meadow, yes, but I never
3  contacted him about this letter.  This was never sent
4  to me, no.
5      Q.  Is that your address at the top of the page
6  of Exhibit 7, 6270 Genaw Road?
7      A.  That's it, yeah.
8      Q.  But regardless of whether you received this
9  letter or not, you did contact Mr. Meadow?
10     A.  Yes, I did contact Mr. Meadow, yes.
11     Q.  And it was about the end of April 2004,
12  correct, early May, 2004?
13     A.  I can't remember.
14     Q.  Can you tell me what you and Mr. Meadow
15  discussed?
16     A.  We discussed the problem that Morris Wilson
17  stated false claims, lies, and Mr. Meadow told me,
18  well, why didn't you wait the six months?  And I told
19  Mr. Meadow, you sold my mortgage, so you're not
20  obligated anymore.
21     Q.  What led you to believe that?
22     A.  Because it was -- because they're so
23  elusive.  I couldn't even contact him.  I couldn't
24  call back.  I couldn't get in touch with Mr. Wilson.
25  Now I'm yesterday's newspaper or what?

**51**

1      Q.  I'm not sure I --
2      A.  You're looking too deep into it, man.
3      Q.  I'm not sure I understand.
4          You're saying Eric Meadow said to you
5  why didn't you wait the six months?
6      A.  I complained to Eric Meadow about what
7  Morris Wilson told me, and he told me that why didn't
8  I wait the six months, the six months being that I
9  was supposed to get a two-point reduction in my
10  mortgage, why didn't I wait the six months?
11         Well, why would I wait the six months?
12  If they sold my mortgage to somebody else, then New
13  Century doesn't know anything about what was said or
14  what was, you know.
15     Q.  Did New Century tell you that American
16  Equity Mortgage would not refinance your loan?
17     A.  No.  New Century doesn't want anything --
18  they just looked at the contract and said, hey, look
19  it, this is what it is, that's it.
20     Q.  So they said nothing about what American
21  Equity Mortgage would or would not do?
22     A.  Oh, no, no.  I didn't even know American
23  Equity and New Century were even in touch with each
24  other forwarding each other anything, no, I had no
25  idea.

**52**

1      Q.  I'm not asking that.  I want to be clear.
2  I'm not asking whether you knew what the
3  relationship, if any, between New Century and
4  American Equity was.
5          I'm asking you if New Century said
6  anything to you either in a letter or on the phone
7  about what American Equity Mortgage would or would
8  not do?
9      A.  No.
10     Q.  What else did you and Mr. Meadow discuss on
11  the telephone?
12     A.  He told me that he would fax me over some
13  papers.  I was at work.  Fax me over the papers.
14     Q.  What papers?
15     A.  I thought were another contract closing
16  papers.  He asked me, he says, what do you prefer,
17  just like when you offered me, $3,500 or $4,000, or
18  would you like the 6.45 interest?
19     Q.  Okay.  So you're saying he offered you
20  either some cash or to refinance your loan?
21     A.  Right.
22     Q.  Even though you hadn't waited the six
23  months, you said okay, we'll do it now?
24     A.  Right.
25     Q.  Because you wanted it then?

**53**

1      A.  Mm-hmm.
2      Q.  And he offered that to you?
3      A.  Yes.
4      Q.  And he asked you if he could fax some
5  paperwork over to you?
6      A.  Yes, he wanted to fax paperwork over to me,
7  yes.
8      Q.  Did he explain that you had to apply for
9  the refinance?
10     A.  No.
11     Q.  Did you look at the paperwork that he sent
12  over to you?
13     A.  I looked at it as being a contract that he
14  sent over to me.
15     Q.  Okay.  I understand that's what you looked
16  at it as, but I guess I'm wondering if you looked at
17  it, the documents themselves, and I'll hand you
18  what's going to be marked as Exhibit 8 to your
19  deposition.
20     A.  He told me --
21     Q.  Hold on.  Let's get the exhibit in your
22  hands first.
23         (Marked for identification Deposition
24          Exhibit No. 8.)
25     Q.  Exhibit 8 to your deposition, which is also

**54**

1  Exhibit 2 attached to your First Amended Complaint,
2  is a handful of pages, you could count them out, but
3  I'd rather not, the first of which is a fax cover
4  sheet dated 5-5-04 to George Manire from Eric Meadow.
5      Is that correct?
6  A.  Mm-hmm.
7  Q.  Please sign and fax back to...and has an
8  arrow to fax number for Eric Meadow; is that
9  accurate?
10  A.  Yes.
11  Q.  And if you take a look at, and you can
12  either thumb through them or you can read them, you
13  can take whatever time you want, the documents that
14  are attached to that cover sheet, which are Exhibit
15  8, and the first one is entitled Good Faith Estimate
16  of Closing Costs, and it's signed by you, correct,
17  dated 5/6/04?
18  A.  Yes.
19  Q.  Is that your signature?
20  A.  Yes.
21  Q.  Any reason to believe you signed it on any
22  other date other than 5/6/04?
23  A.  No.
24  Q.  Do you understand that this document is
25  estimating the amount of costs that you would have to

**55**

1  pay at closing?
2  A.  Repeat that question.
3  Q.  The first paragraph at the top of that
4  document is in writing.  It says:  The information
5  provided below reflects estimates of the charges
6  which you are likely to incur at the settlement of
7  your loan.
8      Does that make sense to you?  Do you
9  understand what that's saying?
10  A.  Yeah.  Yeah, that's right.  This is --
11  Q.  What's going to happen, this is about what
12  they estimate it's going to cost?
13  A.  No, no, this is what's supposed to have
14  already have happened.
15  Q.  So when you read the words, The information
16  provided below reflects estimates of the charges
17  which you are likely to incur at the settlement of
18  your loan, you read that to mean something that
19  happened in the past, not something that's going to
20  happen in the future that you're likely to incur?
21  A.  This was supposed to be a new contract.
22  This is what this was.  I explained to Eric Meadow
23  distinctly what the whole problem was.  He said I'll
24  take care of you.  I wanted the interest rate.  He
25  said okay, fine, I'll fax you over documents and you

**56**

1  sign them.
2      Now I'm supposed to really just think
3  everybody is lying, just everybody is a liar and
4  everyone is just falsifying everything?
5  Q.  What is false about what he said to you?
6  A.  Because it never happened.
7  Q.  What never happened?  He faxed the
8  documents over; right?
9  A.  Yeah.
10  Q.  You received them?
11  A.  Mm-hmm.
12  Q.  And you sent them back?
13  A.  And I signed them.
14  Q.  Right.  I'm trying to find out whether you
15  looked at the documents and understood what they
16  were.
17  A.  No, no.  I didn't understand what they
18  were.  I understood they were a new contract.  That's
19  what I understood it was.
20  Q.  Okay.  You used the word contract which is
21  fine.  In this document, Good Faith Estimate of
22  Closing Costs, what is American Equity Mortgage
23  saying to you; what are they agreeing to do?
24  A.  What they're agreeing to do is to fix what
25  they screwed up.  This is what they were supposed to

**57**

1  do.  Why would you send me over documents after me
2  explaining everything to you that didn't mean
3  anything?
4  Q.  When you first did a loan with American
5  Equity Mortgage in January of 2004, you signed
6  documents which I think I marked as Exhibit 1 to your
7  deposition; correct?
8  A.  What's that?
9  Q.  Whether you read the documents or not, the
10  first time you obtained a loan from American Equity
11  Mortgage in January of '04, you signed documents with
12  Mr. Wilson?
13  A.  Right.
14  Q.  They're dated January 13th, '04.
15  A.  One of those, yeah.
16  Q.  Then 16 days later you came in and you
17  signed more documents dated January 29, 2004?
18  A.  Yeah.
19  Q.  The closing documents.
20      Now we're in May of '04, and you're
21  refinancing again, correct, because you asked Mr.
22  Meadow --
23  A.  No, no.
24  Q.  You're not refinancing?
25  A.  No, I'm not refinancing.  I'm not applying.

15 (Pages 54 to 57)

**58**

1  I've already signed. I am contesting that contract
2  with Eric Meadow. That's why he got involved and
3  that's why he sent me this worthless piece of paper
4  over.
5      Q. Why are you contesting the first contract?
6  You said you understood it and you signed it and you
7  agreed to it.
8      A. Because I was led to believe that two
9  points were going to be erased from my interest six
10  months down the road because they have a program.
11     Q. Okay. Six months down the road you're
12  going to get two points off. You signed January
13  29th. It's four months later. It's not six months
14  later; right?
15     A. Yeah, but it's irrelevant. Four months,
16  six months, one month, whatever, because once they
17  sold my contract to another company, they're not
18  obligated anymore. So they're just blowing smoke.
19     Q. Who told you that?
20     A. Who has told me that?
21     Q. Yeah.
22     A. Well, I couldn't get in touch with Eric --
23  I mean Morris Wilson, and I couldn't get in touch --
24  I mean I got in touch with Eric Meadow and then he
25  sends me these papers. I explained to Eric Meadow

**59**

1  everything, that what was said, what was everything
2  is everything.
3      Q. And I understand it, you've said it here
4  about 10 times, maybe more, that you expected in six
5  months to get a different rate, and four months later
6  you're complaining that you want the different rate
7  right then and there.
8      A. Oh, no, I complained right at the
9  beginning.
10     Q. All right. Right at the beginning you
11  wanted a different rate?
12     A. Right at the beginning when they sold my
13  mortgage, okay, and New Century didn't know anything
14  about the program, that's when I complained, that's
15  when I started complaining, then, because I was lied
16  to. You know what lying means?
17     Q. Yeah, I still haven't heard what the lie
18  is.
19     A. Two points, six months down the road with
20  their program, and no one else knew about it but
21  Morris Wilson. He's the only one that knew it. Then
22  I couldn't get in touch with him. Eric Meadow didn't
23  know anything about no program, no two points down
24  the road or anything.
25     Q. So you haven't gotten in touch with Eric

**60**

1  Meadow -- or with Morris Wilson about it?
2      A. I couldn't get in touch.
3      Q. Six months haven't gone by, and you think
4  somehow American Equity Mortgage has lied to you at
5  that point?
6      A. Sure. Why? Because New Century didn't
7  know anything about the program.
8      Q. That's the basis of the lie, because they
9  didn't know about the program?
10     A. They didn't know about the two points
11  reduction in six months. They knew nothing. All
12  that New Century knew was they got my mortgage, they
13  bought their mortgage, and I owe them money. That's
14  all they knew.
15     Q. And based on that you assumed or concluded
16  that Mr. Wilson had lied to you?
17     A. Yes.
18     Q. Any other reason why you thought Mr. Wilson
19  lied to you?
20     A. Well, I couldn't get in touch with him. He
21  never explained to me.
22     Q. Well, you couldn't get in touch with him,
23  that's not a lie; right? Is it?
24     A. If I couldn't get in touch with him then,
25  yeah, I'm assuming that he lied to me, because Eric

**61**

1  Meadow didn't know nothing about the program or two
2  points down the road or nothing.
3      So let me ask you this: If four
4  people I ask don't know about the program then would
5  you assume that it's a lie?
6      Q. Well, I've only heard you ask someone at
7  New Century Mortgage and Eric Meadow.
8      Are there two other people I don't
9  know about?
10     A. Morris, Eric Meadow, New Century Mortgage,
11  three.
12     Q. When did Morris ever tell you that -- you
13  never talked to him; correct?
14     A. I talked to him before.
15     Q. But you never talked to him after?
16     A. No.
17     Q. So he didn't tell you in February, March or
18  April that he wouldn't refinance you for a lower
19  rate?
20     A. I never contacted him, but Eric Meadow was
21  a supervisor and he should know; right? Didn't Eric
22  Meadow say that he's the supervisor and the manager
23  over 80 employees? Wouldn't he know what was said,
24  what was documented, anything?
25     Q. I don't know, but that's why you

Esquire Deposition Services, LLC
(800) 866-5560

**62**

1  concluded --
2      A.  Well, I don't know either.
3      Q.  -- that Mr. Wilson lied to you, the
4  conversation with New Century and the conversation
5  with Eric Meadow? I'm just trying to understand.
6      A.  Yeah, I assumed, right. If my mortgage
7  company doesn't know, if my mortgage company doesn't
8  know what they said, and I was supposed to profit by
9  what they said, then, yeah, I would assume that they
10  lied to me, that they deceived me, yes.
11      Q.  Okay. That's what I'm trying to find out.
12      A.  Well, read the paper. I got the paper
13  sitting right there in front of you. The letter that
14  I wrote there and probably a couple a more.
15          Excuse me, I got to go to the
16  bathroom.
17          (Brief recess.)
18      Q.  So Exhibit 8, which you're free to take a
19  look at and take as much time as you want to do so,
20  is what you thought was the new loan?
21      A.  Is this Exhibit 8?
22      Q.  Yes.
23          You used the word contract, but I'm
24  trying to figure out what you mean by that. I mean
25  did you think this was a new loan?

**63**

1      A.  Yes. I'm a consumer.
2      Q.  I understand that, but, I mean, that's not
3  really the issue here.
4          The question is what those documents
5  are and what you I guess thought they were. Is there
6  a note or a mortgage in those documents in Exhibit 8?
7  There isn't; right?
8      A.  I don't know.
9      Q.  Well, take a look.
10      A.  I don't know what I'm looking at.
11      Q.  Well, take a look at Exhibit 2.
12          We went through Exhibit 2; right?
13      A.  Mm-hmm.
14      Q.  The third page, flip down a couple pages.
15  That document is entitled Note; isn't it?
16      A.  Right.
17      Q.  It's got a date and it's got a dollar
18  amount in it?
19      A.  Right.
20      Q.  That's a note, right; would you agree with
21  me on that?
22      A.  Right.
23      Q.  There's no document that looks anything
24  like that? Does that say Note at the top?
25      A.  It doesn't matter. It says payments,

**64**

1  905.45, 359, Truth-In-Lending Disclosure.
2      Q.  All right. So it's entitled
3  Truth-In-Lending Disclosure?
4      A.  Right, Truth-In-Lending.
5      Q.  It's not entitled Note; is it?
6      A.  No.
7      Q.  The third document in Exhibit No. 2 is
8  entitled Mortgage. I think we looked at it before.
9      A.  Right.
10      Q.  There's no document entitled Mortgage in
11  Exhibit No. 8; is there?
12      A.  In what, the third one, the third page?
13      Q.  Any page. Is there a document entitled
14  Mortgage in Exhibit 8 of all those pages?
15      A.  Mortgage.
16      Q.  That document --
17      A.  I acknowledge a mortgage.
18      Q.  What is that document entitled on top?
19      A.  Servicing Transfer Disclosure Statement.
20      Q.  Okay. It's not entitled Mortgage; is it?
21      A.  No, it's not entitled it. I said mortgage.
22  That's the mortgage.
23      Q.  Well, the word "mortgage" is used in that
24  document?
25      A.  Yeah.

**65**

1      Q.  So are you saying you think that's a
2  mortgage?
3      A.  When I called Eric Meadow up, he faxed all
4  this stuff over to me. Yes, I would assume it's a
5  mortgage, yes.
6      Q.  Pretty simple. All I'm asking you if
7  there's a document that looks like that document
8  right there, which is the third document in Exhibit
9  2, in Exhibit 8? Very simple question.
10      A.  Is there a document like this in here?
11      Q.  Correct.
12      A.  So now what is this Consent to Contract?
13      Q.  Is that the content?
14      A.  Consent to Contact.
15          No.
16          (Marked for identification Deposition
17          Exhibit No. 9.)
18      Q.  Would you take a look at Exhibit 9. It's
19  entitled Uniform Residential Loan Application;
20  correct?
21      A.  Correct.
22      Q.  It's a four-page document?
23      A.  Correct.
24      Q.  The last page you see is signed by you. Is
25  that your handwriting on the document, by the way,

17 (Pages 62 to 65)

MC

**66**

1   filling in the spaces?
2   A.   No.
3   Q.   Look at the last page.
4       Is that your signature?
5   A.   This is my signature here, yes.
6   Q.   And I think the second to last page as
7   well. I may be wrong.
8   A.   Yes, it is.
9   Q.   Okay. Dated 5-6-04?
10  A.   And this document was what? What is this?
11  I mean who made the document out and everything?
12  This was in May?
13  Q.   May 6, '04.
14  A.   So this had to be Eric Meadow.
15      No. This is part of -- this is, no.
16  This is part of what he sent -- what he sent me was
17  all I signed.
18  Q.   Okay.
19  A.   That's all.
20  Q.   Which was Exhibit 8 there?
21  A.   Right. This is all Eric Meadow sent me,
22  yes.
23  Q.   And based on Exhibit 8 you thought you
24  had --
25  A.   A new contract, yes.

**67**

1   Q.   Well, you say new contract. When you say
2   that, do you mean a new loan; is that what you mean
3   by that?
4   A.   I thought of that as being a correction to
5   the problem that I was having, and Eric Meadow was
6   going to take care of it for me, and so when I signed
7   it and he faxed it over, why would you fax something
8   over and ask me to sign things like that when you
9   know the problem? You know, I mean, and then you fax
10  over things that aren't even -- doesn't mean anything
11  and you sign, you tell me to sign here, sign that and
12  everything. So I'm thinking, okay, I'm good to go
13  now because Eric Meadow understands.
14  Q.   What did he understand? What do you think
15  he understood then?
16  A.   He understood that I was having a problem
17  with what Morris Wilson said, okay, about the two
18  points in six months? I said you sold my contract. He
19  the six months? I said you sold my contract. He
20  goes, well, I'll fax over some things, we'll take
21  care of it. I'll either give you $3,500, and he said
22  that, he was correct, or the interest rate of 6.45,
23  and I said I'd take the interest rate. He said I'll
24  fax you over the paperwork.
25      Why would I assume anything else?

**68**

1   Q.   Anything else but what?
2   A.   That that's a new contract.
3   Q.   That's a new note and a new mortgage?
4   A.   Yes.
5   Q.   You don't recall signing a new note or new
6   mortgage in May of 2004?
7   A.   That was the only papers I signed in May.
8   Q.   Do you remember getting phone calls from
9   Mr. Meadow after that asking you for pay stubs and
10  for mortgage payment information?
11  A.   No, that wasn't true. That wasn't true.
12  He called me one time.
13  Q.   And what did he say in that phone call?
14  A.   He left a message.
15  Q.   What did he say in the message?
16  A.   We have a problem.
17  Q.   And what was the problem?
18  A.   I don't know. I didn't call him back. We
19  don't have a problem.
20  Q.   Do you recall sending him information,
21  payroll information, concerning April 11th and April
22  18th payroll information for you?
23  A.   No, I don't remember that. I might have.
24  I don't remember. I sent so much documents. I mean
25  they had all my documents there, so why would he want

**69**

1   anything from me?
2   Q.   Are you saying -- you're asking me, but are
3   you saying he did not ask you for payroll
4   information?
5   A.   He didn't ask me for anything.
6   Q.   Why did you send it to him then?
7   A.   I didn't send him anything.
8   Q.   Take a look at Exhibit 10.
9   A.   That I remember that I sent him.
10      (Marked for identification Deposition
11      Exhibit No. 10.)
12  Q.   Do you remember sending him Exhibit 10,
13  Eric Meadow?
14  A.   I might have. This is my paycheck.
15  Q.   From April 11 of '04 and April 18 of '04?
16  A.   Mm-hmm, yes.
17  Q.   Just so I'm clear, in January of '04 when
18  you initially got a loan from American Equity
19  Mortgage you signed initial documentation on January
20  13th, and then you signed a note, a mortgage, among
21  other documents on January 29th at a closing;
22  correct?
23  A.   Yes.
24  Q.   In May of 2004, you signed some documents,
25  none of which were a note and a mortgage, but you

18 (Pages 66 to 69)

**70**

1    assumed that you didn't have to sign a note and a
2    mortgage in order to get a new rate of 6.45 percent?
3        A.  Correct.
4        Q.  What did you base that assumption on?
5        A.  Ignorance.
6        Q.  Did you call Mr. Meadow in May or June of
7    2004 about your loan with American Equity Mortgage --
8    strike that -- your loan, period?
9        A.  I called him about that, yeah.  In May?
10       Q.  May or June.
11       A.  And I called him for -- I might have had
12   correspondence with him.  I can't remember
13   specifically every conversation that I had with
14   people.
15       Q.  Fair enough.
16           Let me show you what we'll have to
17   mark as Exhibit 11 to your deposition.
18           (Marked for identification Deposition
19           Exhibit No. 11.)
20       Q.  Do you recall receiving that letter from
21   New Century Mortgage, which is dated June 4, '04?
22       A.  Yes, I remember.
23       Q.  And in there they're complaining that New
24   Century -- strike that.
25           New Century is stating to you that

**71**

1    your mortgage payment was short?
2        A.  Yes.
3        Q.  Did you call Mr. Meadow after receiving
4    that letter from New Century?
5        A.  No.
6        Q.  Did you call anybody at New Century after
7    receiving that letter?
8        A.  No, they contacted me.
9        Q.  By telephone?
10       A.  No, by mail.
11       Q.  In addition to this letter, you got another
12   letter from them?
13       A.  It was a closure.
14       Q.  Some time later?
15       A.  No.
16       Q.  How much later?
17       A.  I'd say a month.
18       Q.  Okay.  But in June, specifically June 4th
19   or shortly thereafter when you presumably received
20   that letter, did you contact anybody at either New
21   Century or American Equity Mortgage to discuss that
22   letter, the contents of the letter?
23       A.  I might have.
24       Q.  You might have contacted --
25       A.  I might have contacted them.  I can't

**72**

1    remember.
2        Q.  Do you remember if you told anybody at
3    either New Century or American Equity Mortgage that
4    this letter which is Exhibit 11 is inaccurate, that
5    you do have a new loan and that that is your correct
6    payment?
7        A.  Yes, I did.
8        Q.  Who and when?
9        A.  I can't remember the counselors.  Like I
10   said, it's in California, and when I call up there
11   they're just going to give me another counselor,
12   they're just going to give me this counselor or that
13   counselor, but I have correspondence with a female, I
14   can't remember the woman's name, but I have
15   correspondence with them, and I did call about that
16   when I received this letter, yes.
17       Q.  At New Century in California?
18       A.  Yes.
19       Q.  How about anybody at American Equity
20   Mortgage?
21       A.  No, no.
22       Q.  What did the people at New Century tell
23   you?
24       A.  That I was short, the same with the letter.
25       Q.  And what did you say in response?

**73**

1        A.  I told them I have a new contract, and they
2    said nobody contacted us.
3        Q.  What did you say to that?
4        A.  Oh, really?
5            I assumed it now since so many deceits
6    and so many deceptions, I have pretty much assumed
7    that yeah, okay, it's a lie, and I tried to stick to
8    my guns.
9        Q.  So you never found out from American Equity
10   Mortgage why your payment didn't go down; correct?
11       A.  Why would -- this payment didn't go down?
12       Q.  Why New Century wrote you that letter.
13       A.  They wrote me a letter because it was
14   short.
15       Q.  I understand that, but you never had a
16   conversation with anybody at American Equity Mortgage
17   about that letter, about the New Century letter?
18       A.  I don't think so.  I can't remember, but I
19   don't think I did.
20       Q.  And you never called Eric Meadow and said
21   how come I don't have a new 6.45 percent rate?
22       A.  No, I didn't, because I accepted this right
23   here.
24       Q.  And you don't recall ever signing -- you
25   never did sign a note or a mortgage with a 6.45

19 (Pages 70 to 73)

**74**

1 percent rate?
2      A.   No.
3      Q.   Have you tried to obtain a new note or
4 mortgage or refinancing on your property since?
5      A.   No one would touch me.
6      Q.   Have you tried?
7      A.   Yes.
8      Q.   Who have you applied to?
9      A.   I have applied with Rock Financial. It
10 just was a conversation, nothing about -- no
11 paperwork. As soon as they knew that it was in
12 question, they wouldn't -- they wouldn't touch me.
13      Q.   You never filled out any paperwork with
14 Rock?
15      A.   No.
16      Q.   Any other mortgage company or lender that
17 you asked to refinance your property, your loan?
18      A.   I think it was Ameriquest. There was a
19 couple of them.
20      Q.   I'm sorry, Ameriquest?
21      A.   Yes.
22      Q.   Did you fill out applications with
23 Ameriquest?
24      A.   No.
25      Q.   Telephone conversation only?

**75**

1      A.   Yes.
2      Q.   Is that true of any company you called?
3      A.   Yes.
4      Q.   So before and after dealing with American
5 Equity Mortgage, the only company that ever offered
6 you a rate below 8.3 was American Equity Mortgage; is
7 that fair to say?
8      A.   I never tried anyone else.
9      Q.   Well, you tried National City; correct?
10      A.   Yes, that's true.
11      Q.   And that was before coming to American
12 Equity Mortgage?
13      A.   Right.
14      Q.   And they wouldn't do it?
15      A.   Right, they wouldn't do it.
16      Q.   How much are you claiming your damages are
17 in this lawsuit?
18      A.   How much am I claiming?
19      Q.   Let's go back before that.
20      A.   Okay.
21      Q.   What are you saying American Equity
22 Mortgage didn't do that it should have done?
23      A.   I assumed that they were going to hold onto
24 my contract, wait six months, refinance me for a two
25 point less and that was it. That's all I wanted to

**76**

1 do.
2      Q.   Anything else?
3      A.   No. Two points, that's what they promised
4 and that's what I wanted them to do.
5            (Marked for identification Deposition
6            Exhibit No. 12.)
7      Q.   Take a look at Exhibit 12 to your
8 deposition.
9            Do you ever remember receiving that
10 document from the American Equity Mortgage?
11      A.   No. I never had any contact with Eric
12 Meadow through the mail at all.
13      Q.   If I told you that your lawyer gave that to
14 me this morning, would that change your mind?
15      A.   Well, then I don't remember.
16      Q.   Okay. You don't have any independent
17 memory of it?
18      A.   I have no independent memory, I mean, of
19 all these papers, no.
20      Q.   Take a look at what we'll mark as 13.
21            We'll hold off on that for a second.
22            Let's go back to the question I asked
23 before concerning damages. How much are you claiming
24 in damages in this lawsuit?
25      A.   I want my two points.

**77**

1      Q.   You want a mortgage for six percent?
2      A.   That will work.
3      Q.   Are you claiming any other damages?
4      A.   No. I want them to do what they told me
5 they were going to do, and that's all I want them to
6 do. You think I want this money?
7            MR. DOLAN: Let's go off for a minute.
8            (Brief recess.)
9            MR. DOLAN: I have no more questions.
10 All set. Thank you.
11            MS. HENRY: Thank you.
12            (Deposition concluded at about
13            3:05 p.m.)
14                  *   *   *
15
16
17
18
19
20
21
22
23
24
25

20 (Pages 74 to 77)

)05

78

1   State of Michigan)
2   County of Oakland)
3           Certificate of Notary Public
4       I do hereby certify that the witness, whose
5   attached testimony was taken in the above-entitled
6   matter, was first duly sworn to tell the truth; the
7   testimony contained herein was reduced to writing in
8   the presence of the witness by means of stenography;
9   afterwards transcribed; and is a true and complete
10  transcript of the testimony given by the witness.
11      I further certify that I am not connected
12  by blood or marriage with any of the parties; their
13  attorneys or agents; and that I am not interested,
14  directly or indirectly, in the matter of controversy.
15      In witness whereof, I have hereunto set my
16  hand at Troy, Michigan, County of Oakland, State of
17  Michigan.
18
19
20          Denise M. Kizy, RPR/CRR/CSR-2466
21          Registered Professional Reporter
22          Certified Shorthand Reporter
23          Notary Public, Oakland, Michigan
24          My Commission Expires: 7-28-07
25

21 (Page 78)

Deposition of
Morris Wilson

1              STATE OF MICHIGAN

2        IN THE UNITED STATES DISTRICT COURT

3

4    GEORGE MANIRE,

5                    Plaintiff,

6        -vs-                Case No. 04-60278

7

8    AMERICAN EQUITY MORTGAGE,

9                    Defendant.

10   ─────────────────────────────/

11

12        The deposition of MORRIS WILSON,

13   a witness in the above-entitled cause, taken before

14   Maureen M. McLaughlin, Certified Shorthand Reporter,

15   Registered Professional Reporter, and Notary Public in

16   and for Oakland County, Michigan, at 30500 Van Dyke

17   Avenue, Suite 700, Warren, Michigan, on the 25th day of

18   May, 2005, commencing at 10:09 o'clock a.m., pursuant to

19   the Michigan General Court Rules.

20

21

22

23

24

25

Page 2

```
 1   APPEARANCES:
 2   UAW-GM LEGAL SERVICES PLAN
 3        30500 Van Dyke Avenue, Suite 700
 4        Warren, Michigan  48093
 5        586-574-4400
 6        For the Plaintiff
 7        BY:  SEQUARA M. HENRY
 8   DICKINSON WRIGHT, P.P.L.C.
 9        38525 North Woodward
10        Bloomfield Hills, Michigan  48304
11        248-433-7200
12        For the Defendant
13        BY:  J. BENJAMIN DOLAN, ESQ.
14
15   ALSO PRESENT:  Michael Diaz, Esq.
16
17
18
19
20
21
22
23
24
25
```

Deposition of
Morris Wilson

Page 3

1                    I N D E X

2                                        PAGE

3   Examination by Ms. Henry                4

4

5               E X H I B I T S

6                                    MARKED FOR

7   DESIGNATION                      IDENTIFICATION

8   None

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Deposition of
Morris Wilson

Page 4

1                                    Warren, Michigan

2                                    5-25-05

3                                    At or about 10:09 a.m.

4                        -   -   -

5            M O R R I S   W I L S O N,

6      having first been duly sworn, was examined and testified

7      on his oath as follows:

8            MS. HENRY:  Today is the date and time set for the

9      deposition of Morris Wilson.  The case is George Manire

10     versus American Equity Mortgage.

11           Pursuant to the subpoenas, Mr. Morris is present at

12     the deposition and as well as his attorney, J.  Benjamin

13     Dolan.  There's also a representative from American

14     Equity Mortgage.

15           MR. DIAZ:  Michael Diaz, D-i-a-z, in-house general

16     counsel.

17           MS. HENRY:  Mr. Manire is also present as well as

18     myself, the attorney, Sequara Henry, for the Plaintiff.

19                        EXAMINATION

20     BY MS. HENRY:

21     Q.   Mr. Wilson, please state your full name for the record.

22     A.   Morris Ronald Wilson.

23     Q.   And your place of employment, sir?

24     A.   American Equity Mortgage.

25     Q.   Where is that located?

56f6b142-d2bd-11d9-8735-0040af7d9f88

Page 5

1   A.   That is at One Town Square, Southfield, Michigan.

2   Q.   How long have you been employed there?

3   A.   Will be four years in June.

4   Q.   What is your position with the company?

5   A.   Loan officer.

6   Q.   How long have you held that position?

7   A.   With the company?

8   Q.   Yes.

9   A.   It will be four years in June.

10  Q.   How long have you been a loan officer?

11  A.   Five -- five years.

12  Q.   Five years.  Okay.  What does your job entail?

13  A.   My job entails cold calling, prospecting for business,

14       doing loans and conserving my business and just trying

15       to get business.

16  Q.   Okay.

17  A.   I'm a loan officer.

18  Q.   Do you supervise any employees?

19  A.   No.

20  Q.   Who is your supervisor at the company?

21  A.   My immediate supervisor today is Anthony Williams.

22  Q.   Anthony Williams.  Okay.  And does the supervisor review

23       your work?

24  A.   Absolutely.

25  Q.   And that's a regular procedure at the company?

56f8b142-d2bd-11d9-8736-0040af7d9f88

Page 6

1   A.   Yes.  They know what's usually going on with our loans.

2   Q.   What is the procedures for applying for a loan with

3        American Equity Mortgage?

4   A.   Well, technically you can just call in, okay.  You're

5        assigned to a loan officer.  You at that point would

6        come in for an appointment to sort of discuss what your

7        goals are in doing the loan.  There is a preliminary

8        period where we have to get the loan -- your

9        preapproval, get you preapproval.  We do an appraisal,

10       title work.  We have you come in to close the loan.

11  Q.   Okay.  What documents does a borrower have to produce at

12       the appointment in order to apply for a loan?

13  A.   You would typically need pay stubs, income documentation

14       such as W2s or 1099s, depending on whatever the case may

15       be, driver's license, of course, homeowner's insurance

16       information, and if you could, probably a statement from

17       your current mortgage provider.

18  Q.   Okay.  Did Mr. Manire complete those documents or

19       provide those documents to you?

20  A.   Yes.

21  Q.   And he did apply for a loan with your company?

22  A.   Yes.

23  Q.   You were the loan officer that was assigned to his case?

24  A.   Yes.

25  Q.   Okay.  And at that point you reviewed his loan

58f8b142-d2bd-11d9-8735-0040af7d9f88

Page 7

1        application, his documents, so on and so forth, correct?

2               MR. DOLAN:  I'm just going to object to the form of

3        the question.  You said at that point.  I guess I just

4        want to make sure he understands.

5   BY MS. HENRY:

6   Q.   At the point of his appointment you were the loan

7        officer that was assigned, correct?

8   A.   Correct.

9   Q.   So you reviewed his documents yourself, correct?

10  A.   Correct.

11  Q.   Okay.  And what is the process in reviewing loan

12       applications at American Equity?

13  A.   Don't quite understand the question.  What is the

14       process of reviewing.

15  Q.   The process of maybe -- the process of approval or

16       denial of a loan?

17  A.   Okay.  Once you have provided me the income

18       documentation, so forth, I would complete a preliminary

19       form to go to the investor to be faxed down to the

20       investor along with your application.  They in turn

21       would -- within usually a short period of time would

22       return to me what's known as a preapproval.

23  Q.   Okay.

24  A.   Okay.

25  Q.   And when a person is preapproved for the loan, what are

Deposition of
Morris Wilson

Page 8

1          the next steps that are taken with respect --

2    A.    Well, we have to do the appraisal, make certain that the

3          value is there.  We do title work.  Make sure that

4          there's no liens on the property.  Once we receive all

5          that information we proceed with the closing.

6    Q.    And what are the procedures when a loan is not

7          preapproved, that it's denied?

8    A.    When a loan is not preapproved?

9    Q.    Uh-huh.  Like let's say someone has not received

10         preapproval with the loan.  They fill out the

11         application and it's not preapproved.  What happens

12         then?

13   A.    I don't understand the question.  What do you mean not

14         preapproved?

15   Q.    Let's say it's denied.  The loan is denied.  They fill

16         out the application and the loan is denied.  What is the

17         process at that point?

18   A.    At that point I would call the customer back up and make

19         them aware of the status.

20   Q.    Is this a formal letter sent out or anything like that?

21   A.    I believe, to the best of my knowledge, that on the

22         other end, once the file, once has been totally turned

23         down or denied in the system that there -- a letter

24         would go out to the borrower.

25   Q.    And you're not familiar with the letter that goes out?

Page 9

1   A.   See, because I'm on the loan officer end of it, and that

2        would come from the clerical portion, our home office.

3   Q.   Okay.  Do you usually advise borrowers that the loan

4        will be re-evaluated after six months?

5   A.   Absolutely not.

6   Q.   So you don't remember telling Mr. Manire anything like

7        that?

8   A.   No.

9   Q.   Did you speak to Mr. Manire directly with respect to his

10       loan?

11  A.   At which point?

12  Q.   At the point of the application.

13  A.   Yes, because he would have been right there in front of

14       me --

15  Q.   Were you --

16  A.   -- at the point of the application or at the point of

17       the appointment.

18  Q.   At the point of the appointment?

19  A.   At the point of the appointment he would have been right

20       there in my office, as close as you and I are.

21  Q.   And how many times after the appointment did you speak

22       with Mr. Manire?

23  A.   Very difficult to speak to Mr. Manire.  I want to say

24       maybe two or three times for different issues, things

25       that we may have needed, such as more recent pay stubs

Deposition of
Morris Wilson

1      and so forth.

2   Q.  How many times did he apply for a loan with your

3      company?

4   A.  To the best of my knowledge he only applied once with

5      me.

6   Q.  And what was the outcome of his loan application when

7      dealing with you?

8   A.  What was the outcome of his loan application.  We -- Mr.

9      Manire was approved for a loan and we proceeded and we

10      did a loan.

11   Q.  Do you recall the percentage -- the interest rate?  I'm

12      sorry.

13   A.  Not right offhand.

14   Q.  And did you speak to Mr. Manire any time after the

15      closing of his loan?

16   A.  Not to the best of my knowledge.

17   Q.  So his loan -- he applied for the loan, he was approved

18      for the loan.  You did all of the necessary work --

19   A.  Right.

20   Q.  -- that you had to do, and you had no further contact

21      with him at all?

22   A.  Correct.

23   Q.  Did he ever contact your office to speak with you after

24      the closing of the loan?

25   A.  I don't really recall any time that he attempted to talk

Deposition of
Morris Wilson

Page 11

1        to me after.

2    Q.   Have you ever been disciplined at American Equity

3         Mortgage?

4    A.   No.

5    Q.   And you've stated that you were there four years,

6         correct?

7    A.   Yes.

8    Q.   Okay.

9              MS. HENRY:   Nothing further for Mr. Wilson.

10             (Deposition concluded at 10:18 a.m.)

11                         -    -    -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Certified True Copy

# MORTGAGE

Return To:
American Equity Mortgage, Inc.

11933 Westline Industrial Drive, St. Louis, Missouri  63146

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated January 29, 2004
together with all Riders to this document.
(B) "Borrower" is GEORGE I. MANIRE, a Single Person

Borrower's address is 6270 GENAW RD, COTTRELLVILLE TWP, Michigan  48039
. Borrower is the mortgagor under this Security Instrument.

2004-06-12310

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3023 1/01

-6(MI) (0005)

Page 1 of 15

VMP MORTGAGE FORMS · (800)521-7291

(C) "Lender" is
American Equity Mortgage, Inc.
Lender is a Corporation
organized and existing under the laws of Missouri
Lender's address is 11933 Westline Industrial Drive
St. Louis, Missouri  63146
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated January 29, 2004
The Note states that Borrower owes Lender
One Hundred Forty-Four Thousand and 00/100ths                              Dollars
(U.S. $144,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than March 1, 2034
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |
| | | SEE EXHIBIT A |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

2004-06-12310

-6(MI) (0005)                    Page 2 of 15                              Form 3023 1/01

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the **County**                                        [Type of Recording Jurisdiction]
of **St Clair**                                  [Name of Recording Jurisdiction] :
**SEE EXHIBIT A.**

Parcel ID Number: 74-17-022-4014-000                        which currently has the address of
**6270 GENAW RD**                                                                     [Street]
**COTTRELLVILLE TWP**                            [City] , Michigan **48039**        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

2004-06-12310

-6(MI) (0005)                              Page 3 of 15                              Form 3023 1/01